TOUCH TECHNOLOGIES v. VGO DR. DON WEIR. Thank you, Your Honor. Good morning, and may it please the Court. My name is Don Weir, and I am appearing on behalf of InTouch Technology. This appeal concerns two patents that are for controlling access to telepresence robots by multiple users, and one patent involving controlling the operations of the robot in real time. In the limited time that I have today, I would like to focus on the obviousness issue. InTouch's J-Mal motion with respect to obviousness, and that says to two of the patent. The issues on appeal implicate two legal requirements for an obviousness finding that this Court has recognized provide critical protections against hindsight bias in a finding of obviousness. First is the requirement in KSR and many decisions of this Court that to base obviousness on an asserted combination of prior art references, there must be an articulated reason why a person of ordinary skill in the art at the relevant time would have combined them. The second legal requirement is that... Mr. Weir, it sure looks like all of these components are in the prior art, and the field seems to have been quite crowded. I was looking at the 030 patent, and there's an enormous list of patents, and if you look at the prior art deal, there's an enormous list of patents, dealing with robots. All of the limitations of the claims seem to be in one or another. There's an automatic callback review. There's an arbitration of control. It seems to be all there in the same field. Isn't that correct? I don't think it is correct, but let me say something about the state of the art to put this in context. The state of the art at the time is actually pretty well represented by one of the references that is before the Court, which is the JUPI reference. The JUPI reference refers to the paradigm at that time, which is around 2000, in a telepresence robot. What I mean by telepresence is where the user at a computer is able to project themselves, to project their image, for example, through video, to that remote location through the robot, and the robot has a camera as well and communicates back. The paradigm at that time was one computer, one computer controller, and one robot. The inventors in this case, the Wang inventors, had the idea that there were circumstances in which it would be valuable to allow multiple users to have access to that same one robot. This came up particularly in the healthcare field because you could have a couple of specialists, a specialist in New York, a specialist in Washington, could then diagnose and treat disease. This was a new use, a new idea, to have multiple users who would access. You then had to have a way of controlling that access. You can't be projecting multiple users to the robot, and so this was a new idea. The JUPI reference, if we take the 357 patent, which has both the arbitrator limitation and also the callback limitation, the JUPI patent didn't give anyone any reason to go beyond and look for, beyond that reference, and look for an arbitrator or a callback mechanism because there was only one user. If I just may, as an aside, say that in the briefing from Vigo, there is the suggestion somehow that in that patent that there were actually two computers or two controllers or two control stations. What's your strongest objective indicator of non-obviousness? I would say commercial success, Judge Rader. You tied that trouble with commercial success, it's almost impossible to tie commercial success to a narrow improvement in a patented field. Well, in this case... Marketing, there's a hundred other things that influence commercial success. As I said, before this invention, the paradigm of the robot, telepresence robot, was one robot and one user. So what this invention is really about is multiple users using that same robot, and that is what is embodied in the product that InTouch put on the market, and it was agreed that that product embodied the claims of these patents. It was something new. It was agreed. I think it's important to keep in mind there was no novelty defense, no anticipation defense. So this was something that was brand new to put out on the market, a telepresence robot that could have multiple people use it. There were no sales of such a product. There have been 600 of these placed at over $100,000 a unit, so it's an expensive product. By the way, I would have used industry praise if I were standing down there. Those are the people who know the art, they're the ones who use the art, and for them to praise your feature, Nexus is very easy on this record in this case. Right, and the feature was, again, finding a way, a means, an effective means, an efficient means for multiple users to use the same robot. So we did have industry praise, and we did have licensing. The licensing was from iRobot, which is the industry leader. They took a license in these patents. So I think all of those are important, and I think here that the problem, if I just stick to the objective evidence for a moment, is that the expert, not only did she not give any testimony about the objective expert, that is the defendant's expert, she'd never heard of it. She didn't know that was part of her job, even, to do that balancing of the fourth grand factor. Well, their response is, though, that the jury was properly instructed that they were to consider all these factors, so the fact that on cross-examination you all were able to bring out that the expert's opinion was flawed in that regard is something that the jury can't do. Right, that is their argument, because that's the only thing that they can point to in the record. That is, there is no evidence, there was no rebuttal evidence as to any of these objective factors. So what there is is an instruction. But for a jury to apply that instruction, they have to have some evidence, and the evidence that they need to have when they're asked to balance this fourth grand factor against the teachings of the prior art, is they need to have some evidence as of 2001 as to how would a person of ordinary skill in the art do that balancing. They didn't have any evidence, and so where you have a case where there's no evidence in the record... That we should say that the entire expert's opinion should be disregarded, even as to what someone would learn from the prior art, because the ultimate opinion didn't factor in certain important considerations. I don't think it has to be disregarded. I think an expert can come in. You could have an expert come in and only talk about the teachings of the prior art. And I've done cases where, let's say commercial success is the objective criteria, and we've had an economist come in and talk about that. But I think that the ultimate determination of the prior art is to reflect some balancing of the objective criteria against the teachings of the prior art. And we didn't have that here, so what we would have if we say, if this court affirms, the only thing that you have to do in a case to sustain a finding, a jury verdict of obviousness, is to be able to point to the instruction having been given, and that's all. And that instruction, honestly, is given in every case. I mean, it's part of the standard instruction. Isn't it your better argument that commercial success evidence was unrebutted? It was unrebutted. I mean, I don't think you're going to get us to say the commercial success response has to come from the technical expert. Right, it was unrebutted. It was absolutely unrebutted. Don't you still lose, there's no infringement here? I'm shifting you to the infringement arguments. Well, let me say first, the obviousness or the invalidity is very important, because even if we lose on infringement, we want these patents to be valid. I understand. But no, I think on infringement, and I think the reason I said we focus on obviousness, I think infringement is very well dealt with in briefs. I think the issues are presented. I don't think there are any factual issues, so we're on appeal. The court wants to decide, focus on issues of law. On one patent, the issues on the 357 patent, the issues are erroneous claim construction. The facts are not disputed. It's not disputed that on our claim construction, we win. That's the arbitrator. That's the arbitrator and the callback mechanism. Even if the claim construction is overly broad, doesn't the record support the jury finding? Oh, not at all, because even the judge said, Judge Anderson said, when he denied fees to the defendant under 285 at the end of the case, he said, look, my claim construction didn't mean that this claim doesn't cover first come, first serve. The claim is controlling access on a basis of priority. The doctor gets the first. No, no, no. I'm sorry to interrupt. And the accused device is doing it in a queue without a priority analysis. Well, that is true. There's not a priority analysis, but the priority, the claim in the patent that requires the priority limitation is claim 80. This is claim 79. It does not require any priority analysis, and actually the judge addressed that in his claim construction. He correctly ruled, he correctly rejected Vigo's argument that there must be priority. But on 79, you have the callback mechanism. 79 requires the callback mechanism, that's right. And that's where the judge erred by saying there could be one, there had to be one specific user. And that claim, that interpretation, we say has to be wrong. This is the whole contemplation of this invention is that there are multiple users. They log on to the system. There's a buddy list of authorized people who can log on. They log on, and they see that the robot's unavailable. But you were fine with the claim construction that the judge did on arbitrator until the jury came back finding no infringement, right? It was somewhat unclear because on arbitrator, right, the judge, we were fine with his rejection of the priority limitation, which Vigo asked for. He referred to a determination, making a determination. He referred to that in JMAW is what you're saying. Well, no, his claim construction referred to the system making a determination in order to arbitrator, in order to control access. And you were okay with that. We thought we could live with that because it wasn't until the trial where the Vigo counsel started arguing in closing that that meant that you had to have some active decision making. You had to have priorities and all of that. And then when we came back. During closing. I went and looked at that closing. There was no objection. Correct. You didn't say that that's inconsistent with the claim construction. You had the chance on rebuttal to say to the jury that would have been inconsistent with the claim construction. That's not right. But I think that you're still entitled at the end of the day to measure whether there's substantial evidence to support the claim as construed. And we certainly are entitled anyway in this court to appeal the claim construction because it seems that what the judge did was after he had the jury's verdict, is then he said, well, the jury could have found that arbitrator requires active decision making. And I don't think the jury gets to decide the meaning of the claim to begin with. And certainly not after the fact. And this court has held that in earlier cases. So it appeared that he changed the claim construction during the Jamal phase in order to support the jury's finding. And yet he then came back again in the denial of the 285 motion and said that it couldn't, or that his claim construction didn't preclude first come first serve as a rule that the system, the computer could apply to allocate who has access at any given time. I'm in my rebuttal time now. I'm happy to wear. Why don't we save the rest? Thank you. We'll actually restore your rebuttal time. If you give Ms. Fletcher an extra two minutes, that'll keep time even. Thank you, Your Honor. May it please the court. Lauren Fletcher with my colleague, Sarah Fraser, on behalf of VIGO. InTouch's arguments assume that there wasn't a jury trial here, but there was. And after a five-day jury trial, the jury returned a verdict in favor of VIGO on every single issue. InTouch appeals every aspect of that jury's verdict, but it points to no legal error and substantial evidence supports each portion of the verdict. The judgment should therefore be affirmed. I can address first the invalidity issues. InTouch has not identified any legal error on the invalidity. InTouch does not dispute that the jury was properly instructed as to obviousness. They do point out to a fundamental legal error, which is that the trial court said that the ultimate conclusion of obviousness is left to the jury. I mean, the trial court, I mean, he did say in passing, but even if it weren't, I would probably come up with the same thing. But the trial court never did a KSR analysis. The trial court allowed the issue of obviousness to go to the jury. The jury is presumed to have made all of the factual findings that go to the obviousness analysis. But the trial court's obligation is still then to independently assess whether, based on the underlying findings of fact, that the trial court would believe that it was obvious. And I believe the trial court did do that, both in its opinion making additional findings of fact and conclusions of law, which went to obviousness, and also in its denial of the JMOL motion, finding that the jury's obviousness conclusion was supported by the evidence, and identifying no legal error. The jury was properly instructed that it was required, at the legal standard it was required to apply to determine obviousness, and in the evidence that it was required to consider, including the objective considerations. But you concede that your expert didn't consider objective considerations and you put on no other evidence relating to objective considerations. Vigo did not present evidence of objective considerations, but InTouch did, and that evidence was for the jury and the court in determining obviousness. It was InTouch's burden to prove that there was a nexus between the objective considerations and the claimed inventions. I've read your expert opinion, expert testimony multiple times, and I can't find a single place where the expert ever explains what the motivation would have been in the art, the one skilled in the art, to combine these references. She says repeatedly somebody could do it. She even says at one point, well, you would do it, but she doesn't ever. There's no explanation as to why or how or, I mean, these are very disparate pieces of art, and I don't see a motivation to combine testimony. Well, first of all, Dr. Yankov did provide explanation of why and how a person born near skilled in the art would combine these references, and it's also contained in the references themselves in the way that she explained the references. As the district court found, the technology here was not particularly complex. The claims require a mobile robot with a camera and a monitor and two control stations. The only other elements were the arbitrator and the callback mechanism, which were also individually well-known elements in the art. And so the combination of these three elements did not require a complex process or even modification. Having read through that expert's testimony, Dr. Yankov, I'd give him a D minus in my class for using hindsight in almost every single sentence to assemble the prior art. He uses the invention to assemble it. He uses the invention to explain it. Isn't there a significant problem with the way both the expert dealt with it, and then the district judge in the J-Mall makes almost the same mistakes, doesn't it? Well, I think that Dr. Yankov actually started with the prior art references themselves, not with the claim and not hindsight. So what she did was she started with the JUPI reference, which discloses a telepresence robot and two different remote stations. I hear you say that, but I've read that reference, and I don't see it talking about two different remote stations, not at the same time. It talks about you could have the robot here or you could have it here, but it never talksóthose are alternatives. Those are not simultaneous remote stations. That's a really weak reference. What the prior art discloses is a question of fact, and Dr. Yankov's opinionó and I'll point to the example that she gave from the JUPI referenceó was that it discloses two remote stations, the user station and the immersion room. Now, InTouch doesn't agree with that, but this is a question of fact, and this was her interpretation, her factual interpretation of the reference. At column 17 of JUPI on page A17154, it refers to a connect-to-user-station procedure that establishes the communication connection via the wireless transmitter receiver to the user station or immersion room, and that's what Dr. Yankov relied on when she said that it can beó It talks about one option or the other, not both at the same time. No, and that's the point, is that there's one robot that can be connected to from either station, from either the user station or the immersion room, and her testimony was that an arbitrator would be useful here to determine who has control of the single robot. Is it the user station or the immersion room? And so that's the explanation she gave and the portion of JUPI that she pointed to. She then combined that withó But if you go back and you look at column 16, at the bottom of column 16, at about line 62, it explains that that either-or reference there is talking about two different embodiments. I don't think it is talking about two different embodiments, and that wasn't Dr. Yankov's interpretation of this reference either because when she looked at column 17, she says that the connection can occuró it can connect to either the user station or the immersion room. And so that's the discrepancy that we have,  I think that's one sentence totally out of context of the rest of the patent, which describes two different embodiments, not two things happening at the same time. Well, I think on column 15 and 16, it describes the user station and it separately describes the immersion room, but then it puts them together in column 17 in saying that the robot can connect to either-or, and that was Dr. Yankov's interpretation of this reference, which was presented to the jury. She then looked at the Dudenhofer reference, which teachesóthere's no disputeó it teaches the individual element of arbitration. But that's the micro swarms. Somehow you've got to get into Dudenhofer the priority control, and then you've also got to find a way to get the callback mechanism in there too. Is there any point at which they said this could have been done by a person of skill in the art before the time of invention? Yes, and Dr. Yankov explained thisó No, Dr. Yankov's always going to say it could be done. I think sheó After the time of invention, never does she go back to before the invention. She did testify that she was talking about the point in time of 2001 of when the claimed inventions were made, and at page A10940 is where she provides some motivation for this arbitration system being used in the context of JUPI, which teaches the two remote stations. It wasn't particularly complex, but it didn't lead to me, because all of these individual elements were clearly disclosed and well-known in the art. Her explanation was fairly simple, but it was that if you have the telepresence robot in JUPI, that, as she interpreted it, has the two remote stations using a single robot, then Dudenhofer explains exactly why you would want to use the arbitrator. Where does she say in her testimony that she is going back in time to the relevant point in time and that someone with skill in the art at that point in time would have been motivated to put these things together? I read her to say that if I'm looking at it today, I can take A and I can take B and I can take C and I can put them together. I don't know that she put it all together as articulately as you just did, but she did put each of those components there, and we can find the reference. She did say that she was doing this, that the obviousness determination had to be made from the point in 2001. She also did it based on these references, which were all admittedly prior art. Arbitration was taught in three separate references in Dudenhofer, Schultz, and Goldberg. All Dudenhofer said is that you need some kind of mechanism to deal with conflicting messages that are sent to the same robot. It didn't say that you need to decide who gets to access the robot. It said if the robot receives turn right and turn left, then there needs to be some kind of way to deal with that. Actually, Dudenhofer disclosed both. Looking at page A17179 in the paragraph 5 discussing arbitration, the second sentence there says, arbitration mediation is also needed in the case of shared control when multiple operators may control different functions within the same task force. That's teaching the exact concept of arbitrating between different users who are sharing control of the robot, and that's what Dr. Yank would testify. Her explanation was that a person of ordinary skill in the art of robotics would think, well, what do I do if somebody can't get access to the robot? This brings in the callback mechanism that she found in Roche. It's a pretty simple motivation, but that's all that's needed. It's I have to let them know that the robots become available, and then using Roche together, I believe, would be obvious to a person of ordinary skill in the art of robotics. Again, these aren't very complex ideas, but they are all disclosed in the separate references. And Dr. Yanko explained how they would be combined together and where the motivation came from. It was fairly simple, but it was in the references themselves as she explained them. And this really just amounts to the combination of familiar elements, according to known methods, to yield predictable results. There were no modifications of the individual elements that needed to be made. This was really just their combination, and that should be enough to prove obviousness under KSR. If I can address the objective considerations point. Here the jury was properly instructed that it must consider the objective considerations, and it was presented with evidence of objective considerations from InTouch. It was perfectly within the jury's province to reject those objective considerations because, as the district court found, they were weak and of little relevance. And on these points, InTouch's expert, Dr. Hathwood, did address the objective considerations, and it was all very generic testimony. For example, she relied on InTouch's sales of hundreds of robots, nothing relating specifically or showing any sort of nexus to the claimed invention. Mr. Ware talked about licensing of the invention. There was one license that was relied on, and that was a license with iRobot, but that wasn't just a bare license to the patents in suit. That was a business deal between two companies who are business partners. iRobot has actually invested and helped develop the InTouch robots, and it was a cross-license of multiple patents. So that also doesn't show the required nexus that the license was specifically for the claimed inventions because it was part of a much broader business deal. Dr. Hathwood also relied on tremendous industry praise for the InTouch system, but nothing, again, specifically that goes to the claimed features of the patents. So we would submit that the objective considerations, which were properly considered by the jury, don't affect and don't save the validity of the patents because they lack the nexus that InTouch was required to prove in order to rely on the objective considerations. If I can turn briefly to the non-infringement arguments that were raised, specifically having to do with the arbitrator. One of the things I found most interesting from both sides is that you all have a little bit of difficulty because your arbitrator definition runs up against your validity argument. In other words, the way you want to define arbitrator, which is to require all this detailed analysis, that doesn't show up anywhere in the prior art. And yet the way they want to define arbitrator, which is to be very broad and to essentially just pick between users without any real analysis, seems to come closer to your prior art. So the question is, do you really want the narrower construction that then supports your non-infringement argument, or do you want the broader construction in support of your validity argument? Let me be clear here, and there is no inconsistency, I believe, between the non-infringement and validity position. The claim construction for arbitrator that VIGO advocated at the marking stage was narrower. That proposed construction would have required the specific priority mechanism. That's not what the district court applied. The district court's requirement for arbitrator was that the device or the system has to determine which user has exclusive control of the robot, and that is taught in the prior art. But you did argue to the jury that specific priority was required, and that's what you told the jury that determining meant. No, I don't believe we did. What we said was that the system has to determine who has control, and VIGO doesn't do that because it merely allows access to the robot. It's up to the users to decide who gets to use it, not the system itself. And that was consistent with InTouch's expert's testimony as well, Dr. Hackwood. What we said was priority was one example of a way that a system could arbitrate. We gave multiple examples of that, and they're all disclosed in the patent. It could use a cue, it could use priority. We said those are examples of ways that an arbitrator can determine control, but the key point is that the arbitrator, the system itself, has to make the determination, and VIGO doesn't do that, and there was no evidence that VIGO does that at all. And that's the instruction that went to the jury. The jury was instructed that arbitrator means a device that determines which user or station has exclusive control. Under that definition, or under any of these definitions, VIGO's system doesn't include an arbitrator because it doesn't have the intelligence built into the system to make any sort of determination among which users will have control of the device. Well, if there are no further questions, VIGO respectfully asks that the district court's judgment be affirmed in all respects. Thank you, Ms. Fletcher. Mr. Ware, you have your three minutes. Thank you. Your Honor, VIGO's expert was entitled to her testimony and her opinion, but she's not entitled to her own facts. And she based the obviousness opinion as to the 357 patent on a combination of three references, JUPI, Dudenhofer, and Roche. There is no question that the JUPI reference deals with one computer. It simply describes that in another embodiment, you can have a very, very elegant immersion room that has beautiful video capabilities so that you can better receive the feedback from the remote robot. That column 17 makes it absolutely clear it's one or the other, but it's not both. And that's a huge difference because this is what was new here was the idea of having multiple users who could access this one robot. And so with JUPI, when we're thinking about reason to combine, there is no reason to combine JUPI with a callback mechanism because there's nobody to call back. There's only one user. And I think it's interesting that they say callback is in the prior art. Well, it's certainly not in the robotics prior art. They had to go all the way to a telephone system to find this callback. And the reason it's not in the robotic prior art is because none of these references deal with the situation of multiple users who are going to be given exclusive access for a period of time which actually they can determine. This is what the health care professionals are doing. The Dudenhofer reference, there's also no reason to combine it with JUPI. The Dudenhofer reference is very clear. It's teaching about human interactions with a swarm of a thousand or more robots. And, yes, it makes reference to arbitration, but that reference to arbitration talks about multiple soldiers having access to this swarm who might be sending it, who have shared access to it. None of them has exclusive access to an individual robot. They're sharing access to a whole group of them. And the idea is you have to figure out some way where if one of them is in charge of positioning the robots but somebody else is in charge of deciding, like, which sensors are we going to use? Are we going to turn on the video cameras? Is it going to be audio? Are they going to evaluate toxic fumes? Because the example given in Dudenhofer was a hazardous waste site. So they're not taking over access to an individual robot. So there isn't any reason why you combine these references. These are simply random references out of the prior art, and Dudenhofer was undoubtedly selected because it has the word arbitration in it, and Roche was selected because it has the word callback in it. Those are the only three references that are asserted against the 357 patent. And in the end, the judge looked at this. His JMAL decision is two paragraphs, absolutely cursory. All he did for the so-called reason to combine was cite Dr. Yanko's testimony, where they would ask her a question like, would a person of ordinary skill in the art find it obvious to combine this reference with this reference? And she'd say, yes, that was it. So he just cited that. His discussion of the objective evidence mounted to his saying that the evidence of commercial success, or maybe he said the objective evidence was weak. He didn't say why it was weak. He didn't talk about it. And it was inconsistent with two other orders he entered, for example, when he denied summary judgment, where he said the evidence was significant. Do you have a final thought for us, Mr. Ware? Yes. Oh, there was just one other point I wanted to make, which was that the comment was made on nexus, about nexus on objective evidence. And the comment was made that it was our burden to prove the nexus. I think this Court's decision has made clear it's always the defendant's burden to prove the contrary, the objective evidence. In any case, they didn't contest that at the trial. This is for appellate purposes only. Thank you very much, Your Honor. Thank you, Mr. Ware. That concludes the morning.